No. 103,309

ARTHUR ELDEAN HOCKETT, Individually, and on Behalf of All Others Similarly Situated, *Appellants*, v. THE TREES OIL COMPANY, *Appellee*.

(251 P.3d 65)

Opinion filed May 20, 2011.

*Rex A. Sharp*, of Gunderson, Sharp & Walke L.L.P., of Prairie Village, argued the cause, and *Barbara C. Frankland* and *David E. Sharp*, of the same firm, of Houston, Texas, were with him on the briefs for appellants.

*Jeffrey L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause, and *Will B. Wohlford*, of the same firm, was with him on the brief for appellee.

*Kimberly A. Green* and *David W. Nickel*, of Depew Gillen Rathbun & McInteer LC, of Wichita, were on the brief for *amicus curiae* Kansas Independent Oil and Gas Association.

*Tammie L. Lord*, of Legal Services Bureau, Kansas Department of Revenue, was on the brief for *amicus curiae* Kansas Department of Revenue.

The opinion of the court was delivered by

JOHNSON, J.: Arthur Eldean Hockett appeals the district court's grant of summary judgment in favor of The Trees Oil Company (Oil Company) on Hockett's purported class action against Oil Company for the alleged wrongful withholding of taxes and fees from royalty payments. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL OVERVIEW

Pursuant to an oil and gas lease with Oil Company, Hockett has a ⅛ royalty interest in the production from a Haskell County well which produces natural gas (hereafter referred to as the "Hockett well"). Oil Company operates the Hockett well, along with a number of other oil and gas wells in this state.

Oil Company sells the gas produced from its Haskell County wells to certain entities that the parties refer to as "first purchasers." Helium is extracted from the raw gas and sold separately. Before paying Oil Company for the production, the first purchasers deduct the severance tax imposed by K.S.A. 2010 Supp. 79-4217 and the conservation fee imposed by the Kansas Corporation Commission (KCC) under K.A.R. 82-3-307. Oil Company then pays Hockett ⅛ of the net sales proceeds, *i.e.*, ⅛ of the amount Oil Company actually receives from the first purchaser.

On March 9, 2009, Hockett filed an action against Oil Company, which was styled as a class action. The class was defined in Hockett's petition as: "All royalty owners who were paid royalties for oil and/or gas produced from wells located in Kansas in which The Trees Oil Company has owned any working interest between Jan. 1, 1996 to the present." Hockett claimed that Oil Company had no statutory right to subtract an amount from royalty payments equal to the conservation fee and had no statutory right to deduct a helium severance tax from royalty payments. The petition's prayer declared that Oil Company "should be ordered to provide an accounting and to pay its royalty owners within the Plaintiff Class for underpayment of royalties in the amount of the Conservation Fee deduction taken and severance tax deduction taken on helium."

Oil Company filed a motion to dismiss for failure to state a claim. The motion argued that Oil Company could not be held liable for complying with the KCC regulation on conservation fees and that the severance tax on gas included helium as a matter of law. The district court denied the motion to dismiss but requested the filing of a summary judgment motion.

Hockett filed two motions for partial summary judgment: one addressing the conservation fees question and the other addressing the severance tax issue. Oil Company responded to Hockett's motions and filed a cross-motion for summary judgment. After further summary judgment pleadings, *i.e.*, responses and replies to responses, the district court conducted a hearing on August 31, 2009. On September 23, 2009, the district court filed a journal entry denying Hockett's motions and granting Oil Company's motion for summary judgment. The district court found, in relevant part:

"[O]n the issue of the severance tax, the tax was enacted to be an [e]ncumbrance on the gas stream and all constituents contained therein. For that reason, the Court finds that the severance tax was appropriately charged on helium upon Plaintiff's royalty portion of the recovered helium.

"[O]n the conservation fee charged under K.S.A. 55-176, . . . the state was attempting to impose an oil and gas operations fee and . . . by imposing a mill levy on volume as opposed to a percentage of proceeds from production, . . . the conservation fee was to be imposed on all participants in the oil and gas venture, including the royalty owners."

Hockett appealed to the Court of Appeals, and this court transferred the appeal pursuant to K.S.A. 20-3018(c). Hockett presents two issues on appeal, which we paraphrase as follows: (1) Whether the district court erred in holding that K.S.A. 55-176 imposes a conservation fee on royalty owners; and (2) whether the district court erred in holding that the severance tax imposed on "gas" means that the tax is assessed against helium. We take the liberty of first addressing the severance tax issue.

REIMBURSEMENT FOR WITHHELD SEVERANCE TAX ON HELIUM

A. *Standard of Review*

The ruling from which Hockett appeals is the granting of summary judgment in favor of Oil Company. While it appears that there may be disputed facts in this case, none of them is material to the issue upon which the district court ruled as a matter of law. Accordingly, we review the summary judgment under a de novo standard. See *Genesis Health Club, Inc. v. City of Wichita,* 285 Kan. 1021, 1031, 181 P.3d 549 (2008). Additionally, Hockett asks us to interpret the severance tax statutes, which presents a question of law over which this court exercises unlimited review. See 285 Kan. at 1031.

B. *Analysis*

Hockett asserts that his royalty payments were wrongfully reduced by the amount of severance tax attributable to helium. He apparently does not challenge that the severance tax applies to royalty owners. See K.S.A. 2010 Supp. 79-4217(a) ("Such tax shall be borne ratably by all persons within the term 'producer' as such term is defined in K.S.A. 79-4216, and amendments thereto, in proportion to their respective beneficial interest in the coal, oil, or gas severed."). Rather, the basis for Hockett's claim of wrongful deduction is that he believes there is no statutorily imposed severance tax on the helium component of the extracted gaseous product.

Hockett's statutory interpretation argument begins with the statutory language that imposes "an excise tax upon the severance and production of coal, oil or gas from the earth or water in this state."

K.S.A. 2010 Supp. 79-4217(a). The statute does not explicitly refer to helium. Hockett points out that the term "gas" is defined as "natural gas taken from below the surface of the earth or water in this state, regardless of whether from a gas well or from a well also productive of oil *or any other product.*" (Emphasis added.) K.S.A. 2010 Supp. 79-4216(c). Hockett contends that the physical properties of helium are so different from natural gas that helium must be considered in the "any other product" category. Therefore, he argues that the legislature's inclusion of the "any other product" language in the definition of gas manifests an intent to exclude helium from the severance tax, even though the gaseous helium is randomly commingled with the hydrocarbons and other gases at the time of severance.

Pointedly, Hockett does not discuss another provision in K.S.A. 2010 Supp. 79-4217(a) that specifies the severance tax "shall be applied equally . . . to the gross value of the gas severed and subject to such tax." The Secretary of the Kansas Department of Revenue (KDR) has interpreted this provision to answer the very question presented here, *i.e.,* whether helium is subject to the mineral severance tax. In Revenue Ruling No. 92-1998-01, effective December 31, 1998, the KDR Secretary opined that, since helium is a component of natural gas and is measured as part of the full volume of gas as it is severed, helium contributes to the gross value of gas at the wellhead, making helium subject to the severance tax.

Granted, "[a]n agency's interpretation of a statute is not conclusive; final construction of a statute always rests within the courts." *Denning v. KPERS,* 285 Kan. 1045, 1048, 180 P.3d 564 (2008). However, for purposes of this appeal, the point is that the KDR was explicitly and unequivocally assessing a severance tax on helium during most of the applicable time period. Therefore, the first purchaser had no choice in the matter; it had a legal obligation to collect the severance tax on the gross value of gas produced at the Hockett wellhead, including the tax on Hockett's ⅛ share of the helium, and then to send the money to the KDR. See K.S.A. 79-4220.

Likewise, Oil Company had no control over the tax assessment against the helium component of the severed gas, either as to

Hockett's ⅛ share or Oil Company's ⅞ share. Oil Company never possessed any of the money used to pay the State of Kansas the severance tax and, therefore, it could not have effected a *deduction* of Hockett's share of the tax from the royalties. In effect, Hockett is asking Oil Company to pay his share of the severance tax out of the Oil Company's own pocket, after Oil Company has paid the tax on its own ⅞ share. Hockett provides no basis, either statutory or contractual, for imposing the obligation on an oil and gas lessee to pay the lessor's share of taxes.

The severance tax money that Hockett seeks to recoup went to the State of Kansas. If Hockett believes that the KDR was not statutorily authorized to assess a severance tax on his share of the helium, he should seek redress against that agency. Oil Company has no legal duty to refund the State of Kansas' severance tax to Hockett out of Oil Company's separate funds. Accordingly, on the severance tax issue, Hockett's petition failed to state a claim upon which relief could be granted, and we can affirm the district court's summary judgment in favor of Oil Company. *Cf. Robbins v. City of Wichita*, 285 Kan. 455, 472, 172 P.3d 1187 (2007) (correct result in district court will be upheld even where court relied upon wrong ground or assigned erroneous reasons for decision).

### REIMBURSEMENT FOR WITHHELD CONSERVATION FEES

Hockett also complains about the reduction of his royalty payments by a proportionate share of the conservation fee assessed by the KCC. Hockett's basis for this claim differs from that relied upon in the severance tax claim. Unlike his challenge to the KDR's statutory authority to assess a severance tax on helium, Hockett does not contest the KCC's statutory authority to assess a conservation fee. Rather, Hockett's claim is that Oil Company owes the entire fee and that he, as a royalty owner, has no legal obligation to share in that operational expense.

Accordingly, if Hockett is correct, then Oil Company's royalty payments effectively allocated ⅛ of the conservation fee to Hockett and, in that case, Oil Company would possess the money that Hockett now seeks to recoup. In other words, Oil Company is the proper defendant for this issue. Our task is to determine whether

the conservation fee, like the severance tax, is to be borne ratably by all persons with a beneficial interest in the gas.

A. *Standard of Review*

Again, we are reviewing a summary judgment entered in favor of Oil Company where the material facts are not disputed, and we apply a de novo standard. See *Genesis Health Club, Inc.*, 285 Kan. at 1031. Likewise, this issue involves statutory interpretation over which we exercise unlimited review. 285 Kan. at 1031.

B. *Analysis*

*Statutes and Regulation*

Both parties point to K.S.A. 55-176(a) as providing the statutory authority for the imposition of the conservation fee. That provision states, in relevant part:

"[T]he [KCC] shall assess operators or their designated agents for all or part of the actual costs and expenses incurred in: (1) The supervision, administration, inspection, investigation; (2) the enforcement of this act and the rules and regulations adopted pursuant to this act; and (3) monitoring and inspecting oil and gas lease salt water and oil storage, disposal and emergency facilities."

Elsewhere, the term "operator" is defined as "a person who is responsible for the physical operation and control of a well, gas gathering system or underground porosity storage of natural gas." K.S.A. 55-150(e). Hockett, as a royalty owner, has no responsibility for the physical operation and control of the Hockett well, *i.e.*, Hockett is not an "operator." Likewise, Oil Company does not assert that Hockett is its designated agent. Accordingly, Hockett's straightforward argument is that the plain and unambiguous language of K.S.A. 55-176 only authorizes the KCC to assess a conservation fee against Oil Company, the operator of the Hockett well.

To implement K.S.A. 55-176, the KCC promulgated K.A.R. § 82-3-307, which provides in relevant part:

"In order to pay the conservation division expenses and other costs in connection with the administration of the gas conservation regulations not otherwise provided for, an assessment shall be made as follows.

(a) A charge of 12.90 mills shall be assessed on each 1,000 cubic feet of gas sold or marketed each month. The assessment shall apply only to the first purchaser of gas.

(b) Each month, the first purchaser of the production shall perform the following:

(1) Before paying for the production, deduct an amount equal to the assessment for every 1,000 cubic feet of gas produced and removed from the lease; .

(2) remit the amounts deducted, in a single check if the purchaser desires, to the conservation division when the purchaser makes regular gas payments for this period; and

(3) show all deductions on the regular payment statements to producers and royalty owners or other interested parties."

Oil Company points out that the regulation assesses the conservation fee against the first purchaser, based on the total production, and requires the first purchaser to give written notice to both the producers and the royalty owners. It suggests that this framework supports its contention that the royalty owners proportionately share in postproduction costs and fees. We disagree.

First, the regulation does not explicitly purport to assess the conservation fee against royalty owners. The use of total production to measure the amount of an operator's conservation fee could fulfill the purpose of equally applying the fee to all operators, regardless of the fractional interest being paid as royalty, e.g., ⅛ or ³⁄₁₆. Assessing the fee against the first purchaser may simply be the most effective, efficient means for the KCC to collect the fees. Likewise, the notice requirement would allow a royalty owner to calculate the proper amount of royalty he/she/it should be receiving, given that the first purchaser's payment to the operator is less than the gross sales price.

Next, even if an intent to assess conservation fees against royalty owners could be gleaned from the regulation, the KCC exceeded its statutory authority. See *In re Tax Appeal of Alex R. Masson, Inc.*, 21 Kan. App. 2d 863, 867, 909 P.2d 673 (1995) ("To be valid, a regulation must come within the authority conferred by statute, and a regulation which goes beyond that which the legislature has authorized or which extends the source of its legislative power is void."). Under its plain language, K.S.A. 55-176 simply does not

give the KCC authority to assess conservation fees against royalty owners.

### Contractual Provisions

Oil Company's better argument is that neither the statute nor the regulation precludes a royalty owner from agreeing to pay a proportionate share of the conservation fee, *i.e.*, the issue is governed by the parties' contract. It suggests that the subject contract, *i.e.*, the 1941 oil and gas lease, manifests the parties' intent that the lessor/royalty owner is obligated to share in paying the operator's conservation fee, which was statutorily authorized some 45 years after the lease's execution. See L. 1986, ch. 201, sec. 28 (initial adoption of K.S.A. 55-176). Oil Company divines this intent from the language of the lease's royalty clause, which states: "The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well."

Oil Company asserts that it sells Hockett's gas at the well, so that he is only entitled to receive "one-eighth (⅛) of the proceeds." It then recites selected quotes from a number of Kansas cases to support its argument that "proceeds" refers to the money Oil Company actually receives from the first purchaser. See, *e.g.*, *Matzen v. Cities Service Oil Co.*, 233 Kan 846, Syl. ¶ 9, 667 P.2d 337 (1983) ("An oil and gas lease which provides that the lessee shall pay . . . one-eighth of the proceeds if sold at the well . . . is clear and unambiguous as to gas sold at the wellhead by the lessee in a good faith sale, and [the royalty holder] is entitled to no more than his proportionate share of the amount actually received by the lessee for the sale of the gas."); *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, Syl. ¶ 5, 562 P.2d 1 (1977) ("Where a lease calls for royalties based on the 'proceeds' from the sale of gas, the term 'proceeds' means the money obtained from an actual sale and lawfully retained by the seller."); *Waechter v. Amoco Production Co.*, 217 Kan. 489, 512, 537 P.2d 228 (1975) ("Proceeds ordinarily refer to the money obtained by an actual sale."). Under Oil Company's interpretation of those cases, "proceeds" in this case means the

amount of cash-in-hand it receives from the first purchaser, after the first purchaser makes the deductions mandated by state agencies, such as the conservation fee deduction. Accordingly, Oil Company argues that it complied with the lease's royalty clause when it sent Hockett ⅛ of the actual money transferred to its possession from the first purchaser.

The holdings in Oil Company's cited cases do not support its proffered definition of "proceeds" as being the sale price less conservation fee deductions. For instance, in *Waechter*, this court was called upon to construe a royalty clause which utilized the same language as presented in this case. Later, a lease containing such a royalty clause would become known as a *Waechter* lease. See *Matzen*, 233 Kan. at 850; *Lightcap*, 221 Kan. at 458.

Highly simplified, in *Waechter* the lessee had a long-standing contract with an interstate gas purchaser, which was subject to federal regulatory approval. The contract paid the lessee a price per thousand cubic feet (mcf) that was allegedly less than the then current market value of gas at the wellhead. One of the questions presented on appeal was whether the term "proceeds" in the subject royalty clause meant the price per mcf in the purchase contract between lessee and purchaser which had been approved by federal regulators (sale price), or meant the prevailing market rate per mcf of a willing seller and willing buyer without regard to either the purchase contract or regulatory constraints (market value). *Waechter* held that "where gas is sold at the wellhead there are 'proceeds' of that sale—the amount received by the seller from the purchaser." 217 Kan. at 512.

Obviously, in defining "proceeds" in terms of the amount *received* by the lessee/seller, *Waechter* was merely distinguishing the actual gross contract rate per mcf from a hypothetical wellhead market rate per mcf. The opinion did not purport to address the impact on royalties of any deductions from the gross sale price which the purchaser might make to pay expenses attributable to the lessee/seller. To the contrary, *Waechter*'s holding would actually support Hockett's argument that royalties are to be computed based upon the gross sale price.

*Lightcap,* 221 Kan. at 448, closely paralleled *Waechter.* Oil Company points to *Lightcap*'s declaration that "the term 'proceeds' means the money obtained from an actual sale *and lawfully retained by the seller.*" (Emphasis added.) 221 Kan. 448, Syl. ¶ 5. The reference to "lawfully retained" was inserted to address the fact that the federal regulatory agency had disapproved the contract rate as filed and had adjusted the rate downward. 221 Kan. at 451. The seller could only keep that portion of the sale price paid by the purchaser which was based on a federally-approved rate. Accordingly, the "proceeds" of the sale for royalty purposes only included that portion of the sale price that the lessee/seller was legally authorized to receive. Again, the case has nothing to do with state-mandated deductions from a federally approved gross sale price.

In *Matzen,* the issues again revolved around whether royalty owners were entitled to an amount in excess of their proportionate share of the sale price based upon a hypothetical market value of the gas. With respect to the treatment of "proceeds" from the sale of gas at the wellhead, the majority of the *Matzen* court continued "to adhere to the majority opinions in both *Waechter* and *Lightcap.*" 233 Kan. at 860-61. The case adds nothing to the question presented here. Oil Company's citation to *Holmes v. Kewanee Oil Co.,* 233 Kan. 544, 548, 664 P.2d 1335 (1983), is similarly unavailing.

In conclusion, what the cases cited by Oil Company teach us is that the term "proceeds" in a royalty clause refers to the gross sale price in the contract between the first purchaser and the lessee/producer/seller, so long as the contractual rate per mcf has been approved by the applicable regulatory authority. If the lessee claims that it is entitled to compute and pay royalties based upon an amount less than the gross sale price, it must find the authority to do so somewhere other than in the lease's royalty clause.

### Postproduction Expenses

Oil Company makes a fleeting reference to an alleged "longstanding general rule in Kansas that the operator and the royalty owner proportionately share in post-production costs and fees." It

does not explain why the conservation fee should be characterized as a *post*-production cost or expense. To the contrary, the fee is authorized to allow the KCC to police production operations to insure that they are being carried out appropriately. Considering that purpose, the conservation fee is more akin to a production cost. We are not persuaded by this brief argument.

## CONCLUSION

In conclusion, we hold that the KCC is not statutorily authorized to assess the conservation fee against a royalty owner who is not also the operator of the subject well. Accordingly, the conservation fee withheld by the first purchaser is an expense attributable to Oil Company, as the well operator. In computing Hockett's royalties, Oil Company was not permitted to deduct the amount of its conservation fee expense from the gross sale price under the contract with the first purchaser. The district court erred in granting summary judgment to Oil Company on the conservation fee issue; that ruling is reversed, and the matter is remanded for further proceedings.

Affirmed in part and reversed in part.